# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **SCOTT L. RICHARDSON**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10 C 0465 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Scott L. Richardson ("Plaintiff") seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI") under Title XVI. Before this Court is Plaintiff's Motion for Summary Judgment. The parties consented to have this Court conduct any and all proceedings in this case, including entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons discussed below, the Court finds that Plaintiff's motion is granted, and the case is remanded for further proceedings consistent with this opinion.

## I. Procedural History

Plaintiff filed an application for DIB and SSI on December 8, 2005, claiming that his disability began on September 19, 2005. (R. 58.) The Social Security Administration ("SSA")

denied Plaintiff's initial claim on July 18, 2006.  (R. 63.)  Plaintiff requested reconsideration but was again unsuccessful.  He then sought a hearing before an Administrative Law Judge ("ALJ"), and on December 15, 2008, the ALJ issued a written decision finding that Plaintiff was not disabled.  (R. 22.)  Plaintiff filed a timely request for review of the ALJ's decision to the SSA's Appeals Council on December 18, 2008.  (R. 11.)  The Appeals Council denied review on November 25, 2009, and the ALJ's decision became the Commissioner's final decision.  (R. 1.)

## II.  Background

Plaintiff was born on November 24, 1960 and was forty-five years old when he first filed for disability benefits. (R. 58.)  He received a GED and performed two full-time jobs, one as a security officer and the other as a route driver, in the fifteen years prior to filing his disability claim.  (R. 29-30.)

### A.    Medical History

#### 1.    Pre-Surgery

The medical issues involved in this case first exhibited themselves approximately six weeks after Plaintiff was involved in a car accident in 2000.  (R. 403.)  The record does not contain the type or the amount of medical attention Plaintiff received before April 2005, but he began seeking treatment from various physicians for pain around that date.  (R. 241.)  On April 29, 2005 Plaintiff consulted Dr. Parveen K. Varma, M.D. concerning pain in his left upper back at the third costal vertebral joint level.  Dr. Varma administered an injection of cortisone, but during a follow-up examination on May 4, 2005, Plaintiff stated that he was in more pain that

encompassed his left shoulder, left upper arm, and neck. (R. 240-41.) Dr. Varma then ordered an MRI of Plaintiff's neck that revealed that he suffered from degenerative disc disease with multilevel degeneration. (R. 239, 252.)

Dr. Varma recommended conservative, non-surgical remedies – including blocking facet joints, epidural injections, and home exercises – and Plaintiff received an injection of Lidocaine and Dexamethasone into his C6-C7 cervical vertebrae in June 2005. (R. 236-39.) After both injections, Plaintiff reported feeling no pain, and he was able to walk, communicate, and move his legs and arms without any problems. (R. 236, 238.) Unfortunately, the pain in his neck returned, albeit at a diminished intensity. (R. 236, 238.) Based on his relatively young age, Dr. Varma recommended that Plaintiff not receive any further injections and that he continue with his neck exercises. (R. 235.)

These were insufficient to remedy Plaintiff's pain, and on August 26, 2005 he consulted Dr. Ann R. Stroink, a neurosurgeon at Central Illinois Neurohealth Sciences in Bloomington, Illinois. (R. 233.) Dr. Stroink determined that Plaintiff was suffering from cervical spondylosis and signs of an early myelopathy with superimposed cervical radiculopathy. (R. 233.) Dr. Stroink recommended a two-level anterior cervical fusion with partial vertebrechtomy at C5-C6 and C6-C7 along with allograft spinal plating. (R. 233.) A pre-surgery MRI of Plaintiff's neck showed that he suffered from mild to moderate right-sided disc herniation at C5-C6 and mild to moderate left-sided disc herniation at C6-C7 with capping osteophyte formation. (R. 250.) Plaintiff underwent anterior cervical fusion surgery on September 19, 2005. (R. 258-57.) In a report dated September 30, 2005, Dr. Stroink stated that Plaintiff was doing very well ten days after his surgery. (R. 232.) Plaintiff stated that his arm pain was resolved

despite some discomfort radiating into his right arm and tenderness in the right bicipital tendon in his shoulder. (R. 232.)


2.        <u>Post-Surgery Medical History</u>

Plaintiff underwent ten physical therapy treatments from October 5, 2005 to November 2, 2005 at Vital Care Physical Therapy Center in Joliet, Illinois ("Vital Care"). A report dated November 2, 2005 explained that Plaintiff's neck was improving, although specific movements continued to cause soreness and increased pain. (R. 317.) The progress report also stated that Plaintiff was responding well to myofascial release and that he would continue to benefit from two more weeks of physical therapy. (R. 317.) Plaintiff began experiencing headaches about five weeks after his surgery, but an additional MRI of his brain showed unremarkable results. (R. 234.) He returned to physical therapy at Vital Care on November 7 with instructions from Dr. Stroink to increase modalities such as ultrasound and heat and cold packs to be placed on Plaintiff throughout his physical therapy. (R. 321.) After two sessions, however, he discontinued therapy with Vital Care altogether. (R. 320.)


**a.      Dr. Gary Golden**

Dr. Stroink then referred Plaintiff to Action Physical Medicine & Rehabilitation ("Action"), located in Shorewood, Illinois. (R. 293.) On November 30, 2005, Dr. Gary W. Golden stated that Plaintiff claimed he suffered from temporal headaches four to five times a week and also had a sensitivity to light and sound. (R. 293.) Dr. Golden prescribed further physical therapy and medication consisting of Topamax and continued use of Ibuprofen.

(R. 294.)  The record contains physical therapy reports indicating that Plaintiff continued to receive treatment for his pain at Action from November 30, 2005 until May 17, 2006. (R. 265-96.)  The reports show that Plaintiff's asserted pain level was at best a 3 out of 10 and at worst a 7 out of 10 during that time period.

### b.  Dr. Firdaus Hashim

In May of 2006, Dr. Golden referred Plaintiff to Dr. Firdaus Hashim, M.D., a pain specialist.  (R. 34, 224.)  In a medical report by Dr. Hashim dated May 1, 2006, Plaintiff claimed that about one to one-and-a-half months after his surgery there was an onset of headaches and neck pain.  (R. 224.)  The headaches and neck pain seemed related at times, but Plaintiff claimed he felt more pain in the head area.  (R. 224.)  The pain was present bilaterally in the temporal area with occasional pain radiating behind his eye.  (R. 224.)  Plaintiff claimed that his headaches happened about four to five times a week and that each episode lasted up to a few hours.  (R. 224.)  There was usually no way to relieve the pain.  (R. 224.)  Dr. Hashim noted that Plaintiff had minimal tenderness in the neck area and no radiation of pain into the upper extremities.  (R. 224.)  Also, Dr. Hashim stated that Plaintiff underwent Botox and trigger point injections for pain, but they provided no relief.  (R. 224.)  Dr. Hashim's report indicates that Plaintiff was currently taking Motrin and Norco, a prescription pain medication, as well as Remeron, an antidepressant he used to help him sleep.  (R. 225.)

After determining that Plaintiff's pain was probably originating from the bilateral facets at the C1-C2, C3-C4, and C4-C5 level, Dr. Hashim prescribed Celebrex and Zanaflex and ordered a new MRI.  (R. 224-26.)  An October 10, 2006 MRI of his neck showed no significant

change in the minimal disc-osteophyte complexes at C3-C4 and C4-C5 as compared to the prior MRI on September 1, 2005. (R. 378, 379.) However, there was significant improvement at C5-C6 with no significant central canal stenosis detected. (R. 379.) The metallic hardware artifact limited the evaluation of C5-C7. (R. 379.) Otherwise, there was no significant pathology and no significant change when compared to the prior MRI. (R. 379.)

### c.      Additional Records

On November 13, 2006, Dr. Susann Nagpal, M.D. examined Plaintiff. The record contains little information concerning Dr. Nagpal, but she prescribed a soft cervical collar, ice packs, moist heat, and Ibuprofen. (R. 382.) Plaintiff also attended eighteen physical therapy visits from April through June, 2007. (R. 396.) Plaintiff reported a decreased pain level from a 6 to a 5 out of 10, but no change in neck stiffness or headaches. (R. 396.) Notwithstanding, Plaintiff made some progress in his physical therapy both in decreasing his pain, as well as meeting four out of five goals initially established for his therapy. (R. 396.)

A final MRI dated February 21, 2008 indicates that other than some central spondylosis at C5-C6 the appearance of Plaintiff's cervical spine was "totally satisfactory." (R. 414.) There was no compromise to the cord due to the bone spur. (R. 414.) There was a central protrusion of disk material with indentation on the anterior surface of the cord at C4-C5. (R. 414.) There was also some central bulging of disk at C3-C4, but without any spinal cord involvement. (R. 414.)

**B.      Physical Residual Functional Capacity Assessment**

On July 12, 2006, Dr. Michael Nenaber, M.D., a medical consultant for the SSA, conducted a Residual Functional Capacity ("RFC") assessment on Plaintiff.  (R. 332.) Dr. Nenaber noted in his assessment that Plaintiff had some tenderness in the paraspinous musculature of the cervical area.  (R. 332.)  Additionally, Plaintiff's reflexes were 2+ and he experienced a decreased range of motion.  (R. 332.)  The rest of the examination of Plaintiff's back and extremities were within normal limits.  (R. 332.)  Dr. Nenaber recommended a medium work restriction based on the Plaintiff's exertional limits, with an ability to lift fifty pounds occasionally and twenty-five pounds frequently.  (R. 326, 332.)  Plaintiff could also sit, stand, and walk for six hours in an eight-hour day.  (R. 326.)  No push/pull restrictions were found.

**C.      Administrative Law Judge Hearing**

On April 3, 2008, Plaintiff appeared at a hearing before the ALJ.  (R. 25.)  Plaintiff alleged that he stopped working as a nuclear security officer in September 2005 because his pain was getting worse and that he did not return to work after his surgery on September 19, 2005. (R. 29, 32.)  He described his pain as being primarily in the form of severe headaches, as well as neck and arm pain.  He had headaches a couple of times a day, and they occurred up to four or five times a week.  (R. 30, 44.)  Each headache lasted from one to four hours and prevented him from sleeping. (R. 44.)  In spite of his pain, however, Plaintiff no longer took pain medication at the time fo the hearing because of side effects such as fatigue, depression, and difficulty in functioning.  (R. 46.)

Plaintiff stated that he usually woke up at 3:00 a.m. and would sit in his living room chair for a little while, put his feet up, possibly watch television, and try to fall back to sleep "just to get a different position." (R. 36.) He described an ordinary day as one involving limited activities. Plaintiff occasionally tried to wash clothes or dishes for a few minutes and to do some minimal outside activities such as picking up sticks in his yard. Plaintiff further testified that he had difficulty getting dressed and carrying out activities of daily living such as washing and combing his hair. He stated that he could perform certain household tasks to a small extent such as sweeping, vacuuming, and preparing simple meals. He could also perform a limited amount of woodworking as a hobby for approximately an hour to an hour and a half. However, by late morning he was required to rest or to sleep. When headache pains are too intense, he was required to go to his bedroom because he has room-darkening shades that prevent the light from aggravating his condition. (R. 27-38, 48.)

Concerning his pain, Plaintiff stated that it was present in the back center and both sides of his neck, extended down through both of his shoulder blades, and went through his right arm to the forearm. (R. 41.) He described the pain as a "very dull ache in my neck" that is usually present and that is aggravated by activity. (R. 41-2.) Plaintiff further stated that if he tried to pick something up or turned a certain way the pain became sharp and shooting. (R. 41.) Plaintiff alleged that the pain limited the amount of weight that he could lift with his right arm to five pounds and ten pounds with his left arm.[1] (R. 42.)

---

[1] In addition to Plaintiff's testimony, the ALJ also heard testimony from vocational expert ("VE") Gleeann Kehr. As Plaintiff does not raise any issue concerning the VE's statements, however, the Court omits a review of the VE's testimony.

**D.     The ALJ's Findings**

On December 15, 2008, the ALJ issued his decision denying Plaintiff's application for DIB and SSI.  (R. 22.)  The ALJ reviewed Plaintiff's application under the five-step sequential analysis.  (R. 17-22.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 19, 2005, the alleged onset date and, at step two, that he had the following severe impairments: degenerative disc disease post-cervical fusion and headaches.  (R. 17.)  The ALJ found at step three that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  (R. 19.)  According to the ALJ, Plaintiff's testimony concerning his condition was not entirely credible, and Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), except that he could only occasional reach with the right upper extremity.  (R. 19-20.)  At step four, the ALJ found Plaintiff incapable of performing any past relevant work.  (R. 21.)  At step five, the ALJ determined that considering Plaintiff's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (R. 21.)

**III.   Legal Standard**

A claim of disability is determined under a sequential five-step analysis.  *See* 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  At the first step, the ALJ considers whether the claimant is engaging in substantial gainful activity.  At the second step, the ALJ evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement.  At the third step, the ALJ compares the impairment to a list of impairments that are

considered conclusively disabling.  If the impairment meets or equals one of the listed

impairments, then the applicant is considered disabled; if the impairment does not meet or equal

a listed impairment, then the evaluation proceeds to step four.  At the fourth step, the ALJ

assesses the applicant's RFC and ability to engage in past relevant work.  If an applicant can

engage in past relevant work, she is not disabled.  If the applicant cannot engage in past relevant

work, the ALJ then assesses whether she can engage in other work in light of her RFC, age,

education, and work experience under step five.

An ALJ's decision is reviewed deferentially and is upheld if it is supported by substantial

evidence.  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).  Substantial evidence means such

"relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

(quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  The reviewing court will not

reweigh the evidence or substitute its judgment for that of the ALJ.  *Id.* (citing *Schmidt v. Apfel*,

201 F.3d 970, 972 (7th Cir. 2000)).  The ALJ must also provide a "logical bridge" between the

evidence and his conclusions but is not required to address every piece of evidence.  *Id.* ("The

ALJ is not required to address every piece of evidence or testimony presented, but must provide

a 'logical bridge' between the evidence and his conclusions.")


## IV.  <u>Discussion</u>

Plaintiff argues that the ALJ erred on two grounds: (1) he incorrectly determined that

Plaintiff's testimony concerning the intensity, persistence, and duration of his symptoms was not

entirely credible, and (2) he failed to provide sufficient reasons for determining that Plaintiff had

the RFC to perform sedentary work.  The Court reviews each of these claims in turn.

## A.    The Credibility Issue

Plaintiff argues that the ALJ erred by finding that his statements concerning the limiting effect of his pain and other symptoms were not entirely credible.  The Court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses."  *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).  An ALJ's credibility determination warrants reversal only if it is so lacking in explanation or support that it is "patently wrong."  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).  An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements.  SSR 96-7p.  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received, medication taken, and functional limitations.  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

Before addressing this issue directly, the Court must first clarify the standard that both parties apply with some inaccuracy to their arguments.  Social Security Ruling 96-7p sets forth a two-step analysis for evaluating a claimant's symptoms such as pain.  At step one, an ALJ is required to consider whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms.  SSR 96-7p.  The ALJ in this case found that such an impairment existed, and Plaintiff argues that the analysis should have stopped at that point and that he should have been found to be disabled.  SSR 96-7p, however, makes clear that once an ALJ has made such a finding at step one, he must proceed to step two in order to evaluate the intensity and persistence of the claimant's symptoms,

as well as the limiting effects they have on the claimant's ability to work.[2]  *Id*.  The ALJ correctly did so here.

For his own part, the Commissioner argues that the ALJ's credibility decision was correct because Plaintiff's claimed limitation "was inconsistent with the objective medical evidence." (Resp. at 9.)  This argument also fails to reflect the full requirements of SSR 96-7p because, to some degree at least, such inconsistency is always present whenever an ALJ makes a credibility determination about a claimant's statements.  Social Security Ruling 96-7p states that an ALJ moves beyond the objective medical record to make a credibility decision "whenever the individual's statements about [the alleged limitations] are not substantiated by objective medical evidence . . . ."  SSR 96-7p.  If the medical record fully supports the claimant's testimony, no credibility determination is required.  If the record does not substantiate the claimed limitations, an ALJ then considers the credibility of statements concerning the intensity and persistence of a claimant's symptoms.

It is only at this stage that an ALJ "must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements."  SSR 96-7p. This includes seven specific factors that Plaintiff in this case argues the ALJ failed to properly consider:  (1) activities of daily living; (2) the duration and intensity of pain or other symptoms;

---

[2]  Plaintiff argues in this regard that "ALJ's [sic] are given [a] difference in their findings of credibility when they follow SSR 96-7p" than when they follow 20 C.F.R. § 404.1529(c)(2), the regulation governing a determination of the persistence and intensity of a claimant's symptoms. (Reply at 2.)  This argument fails on two grounds.  As an issue first raised in Plaintiff's reply brief, this contention has been waived.  *See TAS Distributing Co., Inc. v. Cummins Engine Co., Inc*., 491 F.3d 625, 630-31 (7th Cir. 2007) (noting that "it is well-settled that arguments first made in the reply brief are waived.").  Even if the argument were not waived, Plaintiff provides no support for his position that the requirements under SSR 96-7p differ from those that are binding under the regulation.

(3) factors that precipitate or aggravate symptoms; (4) issues related to medication;

(5) non-medication treatment the claimant has received; (6) non-treatment measures a claimant

has taken to alleviate pain, such as standing or moving in certain ways; and, (7) other factors

affecting an individual's functional limitations and restriction due to his symptoms. SSR 96-7p.

Plaintiff begins his argument by claiming that the ALJ improperly overlooked the full

extent of his testimony concerning his daily activities. This topic is especially important in this

case, and the Court cites the ALJ's discussion of the issue in full:

> In spite of his complaint of debilitating neck and headache pain the
> claimant testified that on a daily basis he was able to wake up as
> early as 3 a.m., drink coffee, wash dishes and later in that morning
> do laundry. He reported having breakfast about 7 a.m. and taking
> a nap for about one hour. He testified that after his nap he would
> take a walk[,] pick up sticks[,] and then go home and sit in his
> recliner or on his couch and read. He also testified that if he began
> to experience one of his headaches, he would just go to bed, if not,
> he testified that he would eat dinner at 6 p.m. and later sit in his
> recliner and go to bed between 10 and 11 p.m. The claimant also
> testified that he was able to dress, groom and bathe independently.
> He stated that he did have some difficulty with combing and
> shampooing his hair and with putting on his socks and shoes. He
> reported that he was able to prepare a meal, do laundry, wash
> dishes, do a little sweeping and vacuuming. He further testified
> that he would do woodworking for a hobby and for exercise he
> would walk and do his stretching exercising. The undersigned
> finds that the claimant has described daily activities which are not
> limited to the extent one would expect, given the complaint of
> disabling symptoms and limitations.

(R. 20-21.) The Commissioner responds to Plaintiff's argument concerning this language by

stating without explanation that "the ALJ reasonably considered Plaintiff's activities of daily

living." (Resp. at 9.) The Commissioner does not clarify, however, what "reasonably

considered" means under the facts of this case. In order for an ALJ's consideration to be

reasonable, it cannot rely merely on a recital of a claimant's description of his household

activities while ignoring "qualifications as to *how* he carried out those activities." *Craft*, 539 F.3d at 680. Moreover, the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

The Court agrees with Plaintiff that the ALJ overlooked significant qualifications that Plaintiff described as part of his daily activities and, as a result, the ALJ placed undue weight on certain aspects of Plaintiff's testimony at the hearing. The ALJ states, for example, that Plaintiff was able to wake up at 3 a.m. "in spite of his complaint," implying that doing so supports a finding that he could perform work at a sedentary level. (R. 20.) This conclusion overlooks that the medical record clearly shows that Plaintiff woke up at 3 a.m. *because* of the pain in his neck, not in spite of it. (R. 224, 403.) The ALJ also failed to note in this regard that Plaintiff testified that he slept, at most, between three and four hours a night and that he was drained of energy throughout the day as a result. (R. 47-48.)

Similar oversights concerning the full range of Plaintiff's testimony abound in the quotation above. The laundry and dishwashing that the ALJ noted, for example, were limited to fifteen minutes a day, (R. 48), and Plaintiff only stated that he *tried* to do such things, not that he actually did them on a daily basis. (R. 36-37.) Plaintiff's ability to dress himself was done only with significant difficulty. (R. 38, 50.) The ALJ provided no explanation of what conflicting evidence in the record casts doubt on this statement or how Plaintiff's testimony that he "might try and pick up a few sticks in the yard" (R. 37) is evidence of activities one would not expect from someone with Plaintiff's self-described limitations. Moreover, the ALJ gave no

consideration at all to statements Plaintiff made at the hearing concerning restrictions on his ability to drive, bend, lift, walk, or move his head during his daily activities.[3]  (R. 42.)

As noted, the Commissioner argues that the ALJ's credibility determination is correct because Plaintiff's alleged restrictions were not supported by objective medical evidence.  Social Security Ruling 96-7p, however, takes particular care in stressing that "*allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence*."  SSR 96-7p (emphasis in original). Instead, an ALJ must consider "all of the evidence in the case record," including comparisons of statements made by a claimant with statements he or she may have made under other circumstances.  In this case, the Commissioner overlooks  that Plaintiff submitted an earlier statement to the SSA on September 30, 2006 in which he described various restrictions on his daily activities in considerable detail.  (R. 144-49.)  This official statement is remarkably consistent with claims Plaintiff made at the hearing, including repeated allegations of severe neck pain, restrictions on the use of arms and legs, a need to rest for significant portions of the day, and limitations on sitting and moving.  (*Id.*)  *See* SSR 97-6p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").  The ALJ did not take such consistency into account in making his finding and, insofar as he perceived inconsistencies between Plaintiff's statements and the

---

[3]  Although not determinative, Plaintiff did not state, as the ALJ assumed, that he drank coffee as part of his daily activities.

record, the ALJ failed to address such discrepancies. *See Carroll v. Barnhart*, 291 F. Supp.2d 783, 797 (N.D. Ill. 2003) ("[A]n ALJ should explain inconsistencies between daily living activities, the medical evidence, and the individual's complaints of pain.").

The ALJ also gave little attention to SSR 96-7p's second and third factors concerning the frequency, intensity, and duration of Plaintiff's pain and the factors that aggravate it. The ALJ's recital of the medical evidence correctly noted that Plaintiff told Dr. Hashim in 2006 that he had headaches four to five times a week and that nothing relieved the pain; he also noted that Plaintiff told Dr. Golden in 2005 that he was sensitive to light and sound. (R. 293.) In his credibility discussion, however, the ALJ's only acknowledgment of Plaintiff's statements concerning the intensity and duration of his symptoms was that (1) if he had a headache "he would just go to bed," and (2) he had "some" difficulty in grooming himself. In reality, Plaintiff's testimony was considerably starker. He stated that a bad headache would require him to go to his bedroom because he had a room-darkening shade that could filter out the light that aggravated his condition, that he had to lie down two to three times a day, that his headache could last up to three or four hours, and that it impaired his ability to concentrate. Plaintiff also stated that his ability to dress and groom himself was "tough" and "rough." These statements are entirely consistent with Plaintiff's earlier description of these issues that he provided to the SSA, as noted above.

The ALJ's consideration of SSR 96-7p's fourth factor related to pain medication presents a mixed picture. The ALJ did note that Plaintiff had taken medications in the past such as Topamax, Ibuprofen, Celebrex, Zanaflex, and Lidoderm patches, and that he had received Botox injections for pain. Left unnoted, however, were other medications that were prescribed to treat

Plaintiff's pain and insomnia. These include cervical facet joint injections, Valium, Norco, and Remeron. (R. 338, 388). *See* SSR 96-7p ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment of pain . . . lends support to an individual's allegations of intense and persistent pain . . . for purposes of judging the credibility of the individual's statements.").

Plaintiff testified at the hearing that he no longer took any prescription medications, and the Commissioner urges the Court to rely on this statement as support for the ALJ's credibility decision. Presumably, the fact that Plaintiff stopped taking medications to control his pain and insomnia would tend to support a finding that his claimed limitations were not entirely credible. Nevertheless, the Commissioner's argument overlooks that the ALJ himself did not include this fact in his decision as a reason for discounting Plaintiff's testimony. Courts cannot restate the ALJ's own evidentiary basis for reaching his decision because "[n]either the Commissioner nor the court may supply reasons for the ALJ" after the fact. *Baker v. Barnhart*, 410 F. Supp.2d 757, 766 (E.D. Wis. 2005); *see also Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

The ALJ gave due consideration to SSR 96-7p's fifth and sixth factors concerning treatments other than medication, as well as measures Plaintiff took to relieve his symptoms. However, not all the ALJ's conclusions were accurate. The ALJ stated, for example, that Plaintiff had met "all five goals" proposed for his final course of therapy. In fact, the relevant report dated June 11, 2007 states only that Plaintiff reached four of his five goals. (R. 396). The

ALJ also stated that Plaintiff showed some improvement in his range of motion, but he did not indicate the degree to which this improved the limitations that were noted in Plaintiff's therapy evaluation – a 50% loss of motion in his cervical spine and right-side bending, and a 75% loss of ability to bend to the left.  (R. 403.)  The ALJ also failed to note that, even with these improvements, Plaintiff "reported no change in neck stiffness and headaches."  (R. 396.)

However, the ALJ overlooked entirely the seventh factor on the limitations and restrictions that result from Plaintiff's pain.  At the hearing, both the ALJ and Plaintiff's attorney elicited in some detail testimony concerning Plaintiff's ability to walk (twenty minutes a day), lift (ten pounds with the left arm; five with the right); grip (none with the right hand); drive (never); stand (1.5 hours); turn his head (not at all); pull things down from overhead (none); and concentrate (impaired).  The ALJ's decision did not consider any of these statements.  The Court can speculate that the ALJ may have believed that the objective medical evidence he cited relieved him of the responsibility to consider such subjective complaints.  SSR 96-7p makes clear, however, that medical evidence "is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence."  SSR 96-7p.

The Court recognizes that an ALJ is not required to provide an elaborate analysis of each individual factor set forth in SSR 96-7p or discuss all of the available evidence on any issue.  *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995); *Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1999).  But an ALJ is always required to articulate the basis of his assessment of the evidence so that a court can follow the path of his reasoning, at least to the point at which a court can

reasonably conclude that the ALJ has considered important evidence. *Scott v. Barnhart*, 291

F.3d 589, 595 (7th Cir. 2002); *see also Lechner v. Barnhart*, 321 F. Supp.2d 1015, 1028

(E.D. Wis. 2004) ("Insistence that ALJs comply with the SSRs is not nitpicking.").  Moreover,

SSR 96-7p requires an ALJ's decision to "contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be sufficiently specific to make clear to

the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight."  SSR 96-7p.  These requirements are

binding, and "[t]he Seventh Circuit has unequivocally held that ALJs must follow the

requirements of the SSR 96-7p when making credibility determinations.  Failure to do so

requires reversal."  *Dogan v. Astrue*, 751 F. Supp.2d 1029, 1042 (N.D. Ind. 2010).

Even considering the latitude given to an ALJ in discussing SSR 96-7p's issues, however,

substantial evidence does not support the credibility determination in this case.  The ALJ's

failure to take full note of Plaintiff's testimony concerning his daily activities, the consistency of

his prior statements with testimony given at the hearing, or the other factors required under

SSR 96-7p do not accord with the an ALJ's obligation to make the basis of his assessment clear

or to "build a logical bridge between the evidence and his conclusion."  *Villano v. Astrue*, 556

F.3d 558, 562 (7th Cir. 2009).  For these reasons, Plaintiff's motion is granted on the credibility

issue.

### B.      The RFC Issue

The ALJ determined that Plaintiff has the RFC to perform sedentary work, with only

occasional reaching with the upper extremity.  (R. 19.)  RFC is defined as the most work activity

a claimant can perform despite the limitations stemming from his impairments. 20 C.F.R. § 404.1545(a). Sedentary work involves lifting no more than ten pounds at a time, with occasional lifting and carrying. A certain amount of walking may be involved, and standing is often necessary. 20 C.F.R. § 404.1567(a). Plaintiff argues that the ALJ failed to discuss how pain limits his ability to work and overlooked the fact that "all neck fusions impact neck movement."[4] (Plt's. Mem. at 14.)

The Commissioner contends that substantial evidence supports the ALJ's finding because consulting physician Dr. Nenebar determined that Plaintiff had the ability to perform work at the even more demanding level of medium exertion. (Resp. at 8.) An ALJ is entitled to rely on the opinion of a consulting physician to support an RFC assessment, even when that opinion conflicts with the findings of a treating physician. *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Ellis v. Barnhart*, 384 F. Supp.2d 1195, 1201-02 (N.D. Ill. 2005). The Commissioner overlooks, however, that the ALJ did not rely on Dr. Nenebar's assessment of Plaintiff's ability to work in order to reach his RFC finding. Indeed, the ALJ failed even to take note in his decision that such a report existed. Accordingly, the Commissioner cannot rely after the fact on medical evidence that the ALJ overlooked as a support for the RFC determination. *See Baker*, 410 F. Supp.2d at 766 ("Neither the Commissioner nor the court may supply reasons for the ALJ.").

---

[4] The Court does not address Plaintiff's assertion concerning the medical effects of a neck fusion. It is well established that ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The same logic applies to courts as well, and the kind of medical finding Plaintiff relies on requires medical evidence. As Plaintiff does not cite to any part of the record in support of his claim, the Court has no grounds to make such a medical finding.

The Commissioner's other arguments supporting the ALJ's RFC finding fail to show why the evidence the ALJ actually relied on supports a conclusion that Plaintiff could perform sedentary work. The Commissioner notes, for example, that Dr. Stroink stated that Plaintiff showed improvement ten days after his surgery and that a 2005 brain MRI was unremarkable. It is undisputed, however, that Plaintiff developed significant pain at a time after both of the record entries the Commissioner cites; Plaintiff sought treatment from pain specialists and was prescribed numerous pain medications and therapies to treat his condition. The Commissioner further relies on the fact that Plaintiff received some physical therapy in 2005 but was discharged from it for non-attendance. Even if Plaintiff's reasons for leaving therapy were relevant to the ALJ's RFC decision, the Commissioner fails to note that a later therapy evaluation dated April 16, 2007 shows that on that date Plaintiff was experiencing a 50% reduction in his ability to move his neck and bend to the right, and a 75% loss in his ability to bend to the left. (R. at 403.) The ALJ correctly noted in his decision that Plaintiff experienced some improvement after that date in his range of motion, but neither the ALJ nor the Commissioner explains the extent of that improvement or why it supports a finding that Plaintiff had the ability to perform sedentary work.

Moreover, the Commissioner's argument that no restrictions on Plaintiff's activities were noted after he received a cervical joint injection in March, 2007 is unpersuasive. Plaintiff was given an injection on March 26, 2007 to reduce his neck pain, and his discharge note states that he might experience some discomfort for up to two days, but that no other restrictions on his activities were required. (R. 387.) The note is clearly a pre-printed discharge form that was intended to provide post-injection instructions, not to evaluate Plaintiff's ability to perform work

duties.  Even assuming the discharge note is relevant, moreover, it is unclear from the form itself who issued it or what qualifications that person had to evaluate Plaintiff's ability to work.

Finally, the Commissioner points out that Plaintiff's pain specialist, Dr. Golden, did not impose any functional restrictions on Plaintiff in his medical evaluations of him.  The relevance of that fact, however, is unclear.  Dr. Golden stated in each of the reports cited by the Commissioner that he was unable to determine when Plaintiff might be able to return to work, thereby plainly indicating that Plaintiff was not able to do so at that time.  The Commissioner does not explain how a medical finding that Plaintiff was not currently able to perform his job duties is substantial evidence for the ALJ's conclusion that he could, in fact, do just that.

More importantly, the Commissioner's arguments do not address Plaintiff's simple, but clear, contention:  the ALJ failed to discuss how pain limits his ability to work and overlooked the requirements of SSR 96-8p.  Social Security Ruling 96-8p contains a section titled "Narrative Discussion Requirement" that lays out topics on which an ALJ must provide some discussion and "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p.  These include "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)" as well as a description of how the evidence supports each of an ALJ's RFC conclusions.  SSR 96-8p.  As SSR 96-8p's language makes clear, such narrative discussions are mandatory, not discretionary, requirements.

Here, the ALJ did not provide any discussion of Plaintiff's ability to carry out a sustained, eight-hour work day.  He also did not provide a discussion of his RFC findings at all and included no medical evidence related to Plaintiff's ability to sit, stand, lift, walk, carry, or reach.

(R. 19-20).  As noted above, the ALJ overlooked Dr. Nenebar's RFC assessment that was provided to the SSA, and he did not cite any of Plaintiff's own testimony concerning his exertional limitations or his inability to sleep, focus, or concentrate.  This includes Plaintiff's statements that lifting even a gallon of milk with his left arm throughout the day would create pain for him, that he had almost no ability to grip with his right hand, and that he could lift only five pounds with his right arm.

An ALJ's failure to explain how he arrived at his exertional conclusions under SSR 96-8p is "in itself sufficient to warrant reversal of the ALJ's decision."  *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  That is the case here, and Plaintiff's motion is granted on the RFC issue.

## V.   Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 20] is granted.  Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**


**MARTIN C. ASHMAN**
**Dated:**  June 9, 2011.                                     United States Magistrate Judge

- 23 -